JAMES F. DUNBAR v. WILLIAM McGILL.

*Evidence—Conversations—Charge to jury.*

1. The fact that a witness is asked if he had a conversation at a certain time, and the matter is left with an affirmative reply, does not always entitle the other party to call out what the conversation was, as was held in *Beaubien v. Cicotte*, 12 Mich. 484. But if such conversation has any bearing on the controversy, it is proper to elicit it.

2. In such a case it is not competent for the counsel, who called out the fact that such a conversation was had, to delay making objection until the witness has partially stated what was said, and thus exclude the balance of the conversation.

3. A jury are not warranted in finding a fact established by a greater probability unless, also, the evidence satisfies them that the fact exists. The conclusion that it exists may be drawn from a preponderance of probabilities in its favor, but the probabilities must be such that the conclusion may be drawn, or it is not proved.

Error to Cass. (Smith, J.) Argued January 20, 1887. Decided February 3, 1887.

Trover. Defendant brings error. Reversed. The facts are stated in the opinion.

*Howell & Carr* and *F. W. Keightley,* for appellant.

*Harsen D. Smith,* for plaintiff.

CHAMPLIN, J. Plaintiff brought an action of trover against defendant to recover damages for the wrongful conversion of 34 sheep. The plea was the general issue.

The plaintiff claimed that, shortly after shearing time in the spring of 1882, he turned his flock of sheep, consisting of 22 ewes and 12 lambs, into the public highway; that they strayed away and became lost to him; that they remained in the highway in the vicinity of Henry Quick's farm from four to six weeks previous to the alleged conversion. This was

about five and one-half miles from plaintiff's residence.

Defendant owns a large number of sheep, dispersed among the farmers in Cass and other counties, and had made a contract with one Root to deliver him some 500 wethers; and in November, 1882, he was selecting out from his various flocks sheep to fill this contract. The sheep were to be delivered to Root at Cassopolis on the twenty-fifth of November. He had in his employment a number of persons to assist in driving. Mr. Quick owned a farm within a mile and a half of Cassopolis, and defendant had arranged with him to keep his sheep over the night of November 23. The first flock to arrive at Quick's farm was driven by defendant's servant Gray. It was nearly dark when he arrived there, and, although he had been told, he had forgotten Quick's name. He saw Mr. Quick standing by the pump as he was driving the sheep, and stopped and had a conversation with him. This fact was called out by the plaintiff, whose witness Gray was, on the direct examination. He was asked by plaintiff's counsel:

"*Q.* When you got along by Mr. Quick's, did you see Mr. Quick anywhere?

"*A.* Yes, sir. When I got along by Mr. Quick's I noticed a flock of sheep about 25 or 30 rods ahead of my flock.

"*Q.* Did you make some inquiry about that flock of sheep of Mr. Quick?

"*A.* Yes, sir."

On cross-examination he was asked if he had a conversation with Mr. Quick when he saw him there, and he replied that he did. Counsel for defendant then asked him this question:

"*Q.* What did you say to him, and he to you?

"*A.* I asked him whose sheep they was in the road, and he said they was a stone-pile; and I said: 'No, beyond that.'"

At this point the plaintiff's counsel interposed an objection that the conversation was not proper, as introducing the declarations of Mr. Quick. The objection was sustained, un-

less it was offered for the purpose of showing that Gray made
some statements to Quick different from what he swore to.
Counsel for defendant then asked:

" *Q.* You may state if, in that conversation, you told Mr..
Quick whose sheep you were driving."

This was also objected to and excluded. These rulings are
the basis of the twentieth and twenty-first assignments of
error, and will be noticed hereafter.

It appears that Gray, after the conversation with Quick,.
drove his sheep on and into the flock of sheep which he saw
in the road, and they became mingled; that, at about that
time, defendant came from the direction of Cassopolis, and
met Gray, who informed him that some stray sheep had run
in with his. It was then too dark to separate them, and they
drove all of the sheep back, and turned them into Quick's
field, and defendant then notified the neighbors that some
stray sheep had got in with his, and inquired about them at
several neighboring farms, but found no owner or claimant..
After putting a second flock of sheep, which other employés.
had driven for him, into another field on Quick's farm,.
defendant, with two of his drivers, Gray and Goodenough,.
drove to Northrop's, and stayed all night, while two other
drivers, Brown and Shaffer, went on to Hale's, beyond North-
rop's, and there stayed all night.

Plaintiff claims that, early on the morning of the twenty-
fourth, defendant drove to Hale's, got Brown, a boy then 13
years of age, and drove directly to the field, some five or six
miles distant, and there separated plaintiff's sheep from his.
own, drove them through two fields, taking down the fences,
and turned them into the fair-ground, and then returned,.
Brown going to meet the other employés, while defendant
drove by a circuitous route into Cassopolis; that the sheep
remained in the fair-ground about a week, and then were
driven away by defendant. Brown testified directly and posi-
tively to going with defendant on the morning of the twenty-

fourth, leaving Hale's with McGill at 7 or 7 o'clock and 15 minutes, and separating out the sheep, and assisting defendant in turning them into the fair-ground. Mrs. Marsh testifies to seeing defendant and Brown driving the sheep to the fair-ground about 9 o'clock in the morning. Brown was corroborated, as to the time he and defendant went to Quick's farm in the morning, by witnesses Grim and Shannafelt. Mrs. Marsh was the only witness who testified to seeing the defendant drive the sheep away from the fair-ground.

The defendant claimed that on the twenty-third he was driving two flocks of sheep, to fill a contract for 500 wethers on the twenty-fifth; that the flock driven by Gray were all wethers, and that they were, by previous arrangement, to be put in Quick's field; that they reached the field ahead of him, and turned the corner, and he took Gray in his buggy and drove past them to turn them back, and, as he headed them, he thought a number ran in with them; that it was then dark, and he supposed that the sheep that ran in were strays; that it was so dark they could not separate them, so they were all turned into Quick's field; that he then drove back, and had the second flock put in another field, and then drove to Northrop's, notifying the neighbors of the supposed stray sheep, and making inquiries of them; that he and Gray and Goodenough stayed at Northrop's, some five and a half miles from Quick's, south-east of Cassopolis, and Brown and Shaffer stayed at Hale's, still further away; that the next morning he did not leave Northrop's before half past 7, and drove directly to Hale's, where his whole force was engaged in sorting sheep until 9 o'clock; that he left them after the sheep were sorted, and drove to the widow Norton's, where more sheep were sorted, and then, leaving his men to bring on the sheep, he drove to Cassopolis, and got Mr. George to go with him to Quick's and sort out the supposed strays; that they got some salt, and left Cassopolis at about 10:30, drove direct to Quick's field, and discovered that the sheep

were all fine-wooled wethers, marked with chalk, and with no strays among them; that he notified the neighbors that there were no strays among his flock, and then, after dinner, drove home, leaving the sheep at Quick's until the next day, when he delivered them to Root.

The defendant positively denied having or seeing plaintiff's sheep; denied ever taking any into or out of the fair-ground; and denied being at Quick's, or Quick's field, earlier than after 10 o'clock on the twenty-fourth, or of ever being there with Brown except on the evening of the twenty-third as stated. To support his testimony he called Ezra Shaw, Andrew Kittell, Mrs. Kern, and read the testimony of Shaffer and Goodenough taken on a former trial, showing his presence at Hale's until 9 o'clock on the morning of the twenty-fourth, and corroborated it with the testimony of Mr. Northrop and Mr. George. He also introduced testimony showing contradictory statements made by Brown.

The defendant contends that he did not have a fair trial; that his case was prejudiced before the jury by the rulings of the court, and by his instructions to the jury.

There are 23 errors assigned, all of which are relied on for a reversal. We shall notice but two.

The defendant was entitled to the conversation inquired after between the witness Gray and Mr. Quick. The plaintiff saw fit to go back of the actual conversion of the sheep by the defendant, and introduce facts and circumstances which preceded and led up to the conversion complained of. All such facts and circumstances were a part of the *res gestæ,* and were so treated by the trial judge in his charge to the jury, who directed the jury that it was proper for them to consider the fact of plaintiff's sheep straying away, of his description of them, of a flock being in the highway of a similar description, the mingling of the sheep, and turning them into the field with his own; that they must take all the testimony, and examine it, and take all these things into

consideration, and say whether there is a preponderance of evidence that defendant did convert these sheep to his use.

It appears that defendant had made arrangement with Mr. Quick to keep his sheep over night, and that he had told the witness Gray of that fact, but he says he had forgotten his name. The plaintiff called out the fact.that he had a conversation with Quick when he arrived at his place; that he saw these sheep 25 or 30 rods ahead of his flock; but he was not inquired of what the conversation was. The conversation was relevant, and might be important. It may have afforded the reason of Gray's driving the sheep forward into this other flock, instead of turning them into Quick's field, as it was agreed should be done.

It is true that the fact that a witness is asked if he had a conversation at a certain time, and the matter is left with an affirmative reply, does not always entitle the other party to call out what the conversation was, as was held in *Beaubien v. Cicotte*, 12 Mich. 484. But it depends upon whether such conversation would have any bearing upon the controversy. If it would, it is proper to elicit the conversation. Moreover, the objection in this case was interposed too late. It was not competent for plaintiff's counsel to delay making objection until the witness had partially answered the question, and then interpose the objection so as to shut out the balance of the conversation. It was competent to show that he told Mr. Quick whose sheep he was driving.

The circuit judge charged the jury as follows:

"Now, gentlemen, the first thing proper for you to consider is, whose sheep was this flock that was running in the road by Mr. Shannafelt's place? Were those sheep the sheep of Mr. Dunbar? And, in determining that, you will take into consideration all the facts that have been shown in relation to that. You have heard Dunbar's description of them. You have heard him state what kind of sheep they were, and how many lambs there were, how many old ones there were. You have also heard the description other folks gave of that flock; more especially Amos Jones. I think he gives a more

minute description than any other witness of those that were running there. It is for you to say, under all these circumstances, was the flock that was there, and had been running there (and nobody else had claimed them),—all these facts taken together, was there a probability that these were Dunbar's sheep? In other words, is there more evidence to show that these were Dunbar's sheep than that they were not his sheep? If there is, you are warranted in finding that they were Dunbar's sheep. If you come to the conclusion that the evidence does not sustain that they were Dunbar's sheep, that would be the end of the case, and your verdict would be for the defendant. If you find that these were Dunbar's sheep,—that there is a greater probability that they were Dunbar's sheep than that they were not,—the next question is, were they turned into the field that evening,—into Quick's field,—as is claimed by the plaintiff."

We think this instruction was misleading. It leaves out of view an important element to be considered in the application of the preponderance of probabilities; and that is, the testimony introduced tending to show that these were plaintiff's sheep must have been of such character and weight as satisfied the jury that the sheep which mingled with defendant's, and which it was claimed defendant converted, were the property of the plaintiff. This question did not depend upon whether there was more evidence to show that these were Dunbar's sheep than that they were not his sheep, but upon the question whether there was sufficient evidence to satisfy the jury that they were his sheep.

There was no evidence introduced that they were not Dunbar's sheep, and there was no positive evidence introduced that they were. The evidence tending to show that they were his rested entirely upon inference; and its sufficiency should have been submitted to the jury, and their attention called to it as one of the necessary facts to be proven by the plaintiff.

The jury were told—and they may have acted upon the instruction—that, if there was more evidence to show that these were plaintiff's sheep than that they were not, they

would be warranted in finding that they were his, and yet the evidence may have failed to convince them that such was the fact. The jury are not warranted in finding a fact established by a greater probability unless, also, the evidence satisfies them that the fact exists. The conclusion that it exists may be drawn from a preponderance of probabilities in its favor, but the probabilities must be such that the conclusion may be and is drawn, or it is not proved.

The judgment is reversed, and a new trial granted.

The other Justices concurred.